UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TAYLOR CARROLL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br>      Plaintiff,<br><br>VERSUS<br><br>SGS AUTOMOTIVE SERVICES, INC.,<br>      Defendant. | * CIVIL ACTION NO. 3:16-cv-00537-<br>* SDD-RLB<br>*<br>*<br>*<br>* JUDGE SHELLY D. DICK<br>*<br>*<br>*<br>* MAGISTRATE RICHARD L.<br>* BOURGEOIS, JR. |

*********************************************

### MEMORANDUM IN SUPPORT OF DEFENDANT'S DAUBERT MOTION TO EXCLUDE CLASS EXPERT

Plaintiff Taylor Carroll ("Carroll") filed a Class Action Complaint against SGS North America, Inc. ("SGS") for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The proposed class consists of individuals "who received an artificial or prerecorded message between October 16, 2013 and May 17, 2017 from a telephone call initiated or made by SGS regarding vehicles that were the subject of a lease that was signed between the dates of October 1, 2009 and September 30, 2013 and administered by American Honda Finance Corporation ["AHFC"]." [Doc. 79, ¶ 31].[1]

To ascertain the members of the proposed class of hundreds of thousands of persons across fifty (50) states, Carroll must be able to identify prior to certification exactly who SGS called. As shown below, meeting that requirement is virtually impossible for many reasons. In countless

---

[1] This Motion is based on the class definition contained in Carroll's Third Amended Complaint [Doc. 79], and in turn, Anya Verkhovskaya's proffered report dated December 17, 2018. On October 11, 2019, Plaintiff moved to certify a different class [Doc 120], and then moved to change the existing definition of the class in the operative complaint to match the definition in his certification motion. [Doc. 121]. If this change is allowed, SGS submits that fact and expert discovery should be reopened to address the revised class parameters. SGS anticipates that it would file a new *Daubert* motion to address any new expert opinions proffered by Carroll.

instances, the alleged TCPA injury (receipt of the call) may not have been sustained by the individual associated with the telephone number when the vehicle was leased, or by the individual currently associated with the telephone number.

Anya Verkhovskaya ("Verkhovskaya") was retained by Carroll to offer an "expert" methodology by which she can purportedly divine the "customary user"[2] of each telephone number SGS called on the date of each call. The individuals she so identified would then, she proposes, automatically be the members of the proposed class. The central element of Verkhovskaya's approach involves providing each number SGS called to a third party database aggregator – LexisNexis. Verkhovskaya intends to rely on LexisNexis to perform a "reverse-append" search of its constantly changing public database to "return[] information about each telephone number, including historic and customary users of the telephone number."[3]

But Verkhovskaya lacks both proper qualifications and a reliable methodology. Her report and testimony should be stricken under Rules 702 and 703 of the Federal Rules of Evidence for the following reasons:

- Verkhovskaya, a nurse by training and education, is not an expert in data analysis or the identification of class members;

- Verkhovskaya has performed no "expert" analysis;

- Verkhovskaya's opinions are based on insufficient facts and data because the work she proposes (including the reverse-append searches through LexisNexis) has not been performed;

- Third party databases (including LexisNexis) cannot reliably be used to determine who SGS called;

---

[2] "The 'customary user' of a phone number refers to the individual who regularly uses the number. The customary user sometimes differs from the 'subscriber' of a phone number, which refers to the individual who officially pays for the phone line and whose name appears in the records of the telephone service providers." *Hunter v. Time Warner Cable Inc.,* 15-cv-6445, 2019 LEXIS 137495 at *7, fn. 3 (S.D. N.Y. Aug. 14, 2019).
[3] *Id.* (quoting report of plaintiffs' expert, Colin Weir.)

2505069.10                                    2

- Fundamental errors in her work product demonstrate that the data handling performed (by her or her staff) was not reliably applied to the facts of the case; and

- Misrepresentations to another court by Verkhovskaya regarding rulings by this Court and other courts' findings warrant exclusion of her testimony.

## ANYA VERKHOVSKAYA'S FLAWED METHODOLOGY AND OPINIONS

### A. Admitted Problems With The Work Performed

Verkhovskaya is President of Class Experts Group, LLC ("CEG"), which purports to be "a provider of litigation support services with a primary focus on data management and data analysis." (Verkhovskaya Report, ¶ 1, Ex. A). CEG staff utilized SQL (Structure Query Language), a programming code, to filter and search the call log database produced by SGS consisting of 4,130,123 calls made by SGS between July 6, 2012 and December 31, 2017. (Verkhovskaya Report, ¶¶ 30-32, Ex. A). This filtering process constitutes "routine data handling work." (Woolfson Affidavit, ¶ 4, Ex. B). That "filtering" by CEG staff included:

- The data was queried to identify dialer-initiated calls with a "left message" disposition code. (Verkhovskaya Report, ¶¶ 34-36, Ex. A);

- The next filter was to remove calls that did not have "Honda" identified as the SGS customer. (Verkhovskaya Report, ¶ 39, Ex. A); and

- The call log data was then sorted to focus on four dispositions referenced in the SGS call logs (a) left message on answering machine – home, (b) left message on answering machine – work, (c) left message with other – home, and (d) left message with other – work. (Verkhovskaya Report, ¶ 40, Ex. A).

CEG then cross-referenced the remaining telephone numbers with data from Interactive Marketing Solutions ("IMS") to attempt to identify wireless numbers. In her December 17, 2018 report, Verkhovskaya claimed that CEG's data filtering identified 59,089 unique wireless telephone numbers which received 262,023 calls from SGS. Those calls made up Verkhovskaya's

"Wireless Class." (Verkhovskaya Report, ¶¶ 45-49, Ex. A). At her October 1, 2019 deposition,[4] Verkhovskaya admitted that CEG's "Output REQ," an Excel spreadsheet Verkhovskaya relied upon as a foundation in reaching her conclusions, contains data and filtering errors. (Verkhovskaya dep., pp. 189-98, Ex. C). On October 10, 2019, Verkhovskaya executed an errata sheet listing "corrections" to her deposition involving over 20,000 telephone numbers and calls. (Dep. Corrections, Ex. D). Verkhovskaya now claims that her "Wireless Class" includes 62,579 telephone numbers and 280,510 calls (Dep. Corrections, Ex. D).

The "left message at home" call disposition, where Verkhovskaya concluded the phone number called was not wireless at the time of the call, created a second class comprised of residential telephone numbers which received a pre-recorded telephone message from SGS. Verkhovskaya claimed that 89,124 unique telephone numbers received a total of 385,960 calls from SGS (Verkhovskaya Report, ¶ 52, Ex. A). In her "corrections" to her deposition ,Verkhovskaya reduced the size of the non-wireless class to 56,108 telephone numbers involving 268,789 calls. (Dep. Corrections, Ex. D). Thus, Verkhovskaya's "corrections" to this class include 33,016 telephone numbers and 111,171 telephone calls.

Based on her invoices, Verkhovskaya billed a total of 17.6 hours for "Data Analysis" prior to the completion of her December 17, 2018 Report. (Verkhovskaya Invoices, Ex. E),[5] The billing descriptions are so vague as to make it impossible to determine what "Data Analysis" Verkhovskaya may have actually performed.

---

[4] The deposition of Verkhovskaya was delayed for numerous months because Verkhovskaya was unable to testify due to medical issues. As a result, the deposition of SGS's expert, Aaron Woolfson, was taken out of order on July 26, 2019 and without the benefit of Verkhovskaya's deposition testimony. SGS was unable to take the deposition of Verkhovskaya until October 1, 2019.

[5] When Verkhovskaya was retained in this matter, she was employed by DRRT Litigation Support Services. The first three invoices were issued by DRRT. The remaining invoices were issued by CEG. SGS was able to determine which entries relate to Verkhovskaya because her billing rate is $525.00 per hour.

## B. The Work Proposed But Not Performed.

SGS was attempting to schedule an end of lease vehicle inspection when it called Carroll. The vehicle was actually leased by Carroll's wife, Cindy Carroll. In her credit application, Mrs. Carroll misrepresented Carroll's cell phone number as being her home number [Doc. 26-1, p. 2].

As a result, the calls Taylor Carroll complains about were intended for Cindy Carroll rather than for him. That is why Taylor Carroll is not identified in the AHFC lease documents or in the SGS database. Verkhovskaya was able to associate Carroll with the telephone number provided by his wife only by using the reverse-append methodology, after Verkhovskaya sent the number to LexisNexis. (Verkhovskaya Rebuttal Report, ¶ 19, Ex. F). LexisNexis identified Mr. Carroll as the user of the telephone number at the time of the SGS calls. LexisNexis did not associate Cindy Carroll with the 225-266-xxxx telephone number she provided to AHFC. (Verkhovskaya dep., pp. 174-175, Ex. C).

Remarkably, at this point, Carroll is the sole class member identified by or ascertained by Verkhovskaya. Under her proposed "cart before the horse" approach that is improper as a matter of law,[6] only in the event, and <u>after</u>, the Court might certify the class would she then try to ascertain or identify hundreds of thousands of other class members. To do so, Verkhovskaya proposes to at that point to provide files containing the telephone numbers called by SGS to LexisNexis. (Verkhovskaya Report, ¶ 63, Ex. A). If LexisNexis does not associate anyone with a number, Verkhovskaya would perform the same reverse-append search utilizing a competing public aggregated database from TransUnion. (Verkhovskaya Report, ¶ 65, Ex. A).

---

[6] *See, e.g., Carrera v. Bayer,* 727 F.3d 300, 306-07 and 311 (3rd Cir. 2013) ("At this stage in the litigation, the district court will not actually see the model in action. Rather, it will just be told that the model will operate with plaintiff's assurances it will be effective.") Such assurances that a party 'intends or plans to meet the requirement' are not sufficient to satisfy Rule 23"); *Hunter v. Time Warner,* (S.D.N.Y. Aug. 14, 2019) (determining class membership is properly considered at the class certification stage under order the rubric of preponderance).

A LexisNexis reverse-append search may return multiple names associated with a specific telephone number (Verkhovskaya dep., p. 179, Ex. C). Verkhovskaya purports to utilize an unidentified name matching software, or "black box," to determine which individual among the conflicting names from the LexisNexis database was the actual person who may have received a call from SGS. (Verkhovskaya dep., p. 182, Ex. C). In some instances, Verkhovskaya claims this "special" software will provide a clear match. In other instances, the output from the name matching software produces, in her words, a "fuzzy match." (Verkhovskaya dep., pp. 182-183, Ex. C). At that point, Verkhovskaya would have to review the records manually and make "judgment calls" based on her "knowledge and expertise." (Verkhovskaya dep., p. 183, Ex. C). And yet, in other instances, the data conflicts are so overwhelming that Verkhovskaya cannot even make a judgment call to ascertain the class members who SGS called. For example, in the event that LexisNexis identifies five different people with no apparent relationship to each other as associated with a particular phone number, Verkhovskaya would recommend to the Court that notice of the class action be provided to <u>all five</u> individuals. (Verkhovskaya dep., p. 177, Ex. C).

## THE DAUBERT STANDARD UNDER F.R.E. 702 AND 703.

A *Daubert* inquiry is necessary where "expert testimony [is] offered to prove satisfaction of Rule 23's requirements." *In re Blood Reagents,* 783 F.3d 183, 187-88 n.8 (3d Cir. 2015); *see also Sher v. Raytheon Co.,* 419 F. App'x 887, 890-91 (11th Cir. 2011) (finding the district court's failure to conduct a *Daubert*-like critique of the expert's qualifications prior to granting class certification was error and finding *Honda Motor Co. v. Allen,* 600 F.3d 813 (7th Cir. 2010) "persuasive" that *Daubert* applies). In *Daubert,* the United States Supreme Court held that "the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2nd 469 (1993). As the party offering this expert witness, Carroll bears

the burden here of proving that the proposed expert testimony is admissible. *Sims v. Kia Motors of Am., Inc.* 839 F.3d 393,400 (5th Cir. 2016).

An expert must do more than "simply demonstrate a general knowledge in a particular field" to be permitted to testify. *Lofton v. Gen. Motors Corp.*, 33 F.3d 1379, at *3 (5th Cir. 1994); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). Qualifications are also not enough – the methodology utilized in the case is paramount. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 537 (5th Cir. 2013); *see also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[W]hile an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. By the same token, a reliable opinion expressed by a genuinely qualified expert may not help the jury if it does not pertain to a fact at issue in the case.").

The Court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (en banc) (citation omitted); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). It is inappropriate to admit an expert's opinions that are "connected to existing data only by the *ipse dixit* of the expert." *See id.* at 146.

An expert must satisfy all of the following to warrant admissibility under Rules 702 and 703:

1. qualification by knowledge, skill, experience, training, or education;
2. possession of scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue;

3. the testimony must be based on sufficient facts or data;

4. the testimony must be the product of reliable principles and methods; and

5. the principles and methods must have been reliably applied to the facts of the case.

Fed. R. Evid. 702.

**LEGAL ARGUMENT**

**I.    VERKHOVSKAYA IS NOT AN EXPERT IN CLASS ACTION – RELATED DATA ANALYSIS OR THE IDENTIFICATION OF CLASS MEMBERS**

Verkhovskaya describes her expertise as "class action – related data analysis, [and] location and identification of class members." (Verkhovskaya dep., p. 9, Ex. C). Neither her expert report nor her curriculum vitae describe her educational background. Verkhovskaya's only post high school degree is a B.S. degree from Molloy College in nursing. (Verkhovskaya dep., *Luster v. Green Tree*, pp. 9-10, Ex. G). Statistics may be a recognized course of study taught to college nursing students, but Verkhovskaya has no separate education or training in statistics or data analysis and does not claim to be an expert in statistics. (Verkhovskaya dep., p. 14, Ex. C).[7]

Verkhovskaya lacks any objective hallmark of scientific expertise in "data analysis" or the "identification of class members". There is no accreditation group, certifying agency, board, licensing structure, or professional association for her purported specialty. (Verkhovskaya dep., pp. 12-13, Ex. C). According to Verkhovskaya, there is no educational requirement to become a professional in her purported field. (*Id.*). Verkhovskaya has never published in her alleged areas of expertise nor is there a journal related to her field. (*Id.*).

---

[7] In the *McMillion* case, Verkhovskaya testified that she had been involved in settlement stage administration for over 1,500 class actions. (Verkhovskaya testimony, *McMillion v. Rash Curtis,* p. 119, Ex. H). Verkhovskaya is typically retained to provide what can be fairly described as ministerial settlement administration services, including mailing notice to class members, after the class has been certified. (Verkhovskaya dep., *Krakauer v. Dish Network* dep., p. 26, Ex. ___).

While Verkhovskaya does have experience related to class actions, that experience is primarily limited to administering and mailing or providing notice to a class previously ascertained by someone other than her. There is, of course, a substantial difference between acting as a settlement administrator to provide notice to a class that has already been ascertained and ascertaining the members of the class. As of 2015, Verkhovskaya testified that she had no experience ascertaining the members of the class. (Verkhovskaya dep., *Roberts v. Wyndham Int'l, Inc.*, p. 12, Ex. I). So, at best, her experience has only recently been developed.

## II. VERKHOVSKAYA HAS PERFORMED NO "EXPERT" ANALYSIS

The "data analysis" Verkhovskaya purports to have done to date requires no expertise. Thus far, her company has performed only "routine data handling work": conducting a few SQL searches or "filters" of the call data logs produced by SGS (Woolfson Affidavit, ¶ 4, Ex. B). But even this routine data handling is beyond Verkhovskaya's personal technical proficiency. Just last year Verkhovskaya testified that she was not capable of using the SQL program to perform even these simple tasks. (Verkhovskaya *AB Data* transcript, p. 10, Ex. K). In this case, she conceded that there are "probably 20" different areas of SQL expertise, none of which apply to her. (Verkhovskaya dep., p. 30, Ex.C).

The remaining work she proposes here involves restating a list of phone numbers to third party aggregators of constantly changing public information available at that time and then hoping to match that vendor's collection of "associated" names to the phone numbers called by SGS. There is nothing "expert" about simply regurgitating data contained in the records of third party vendors, or Carroll could have just listed LeixNexis or TransUnion as his experts. As another Court rightly suggested when presented with a similar Verkhovskaya-prepared expert report:

> Initially, the Court doubts that Verkhovskaya needs to be an expert to perform the limited tabulations in the Affidavit.

*Lavigne v. First Cmty. Bancshares, Inc.*, 2018 W.L. 2694457, *3 (D. New Mex. 2018); *see also West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 305 (N.D. Cal. 2017) ("the court finds that no specialized knowledge is necessary to testify regarding the general contents of defendants' call records which defendants produced in discovery.").

Simply put, comparing names from one list to another and retabulating to see if they might match is not "expertise." Verkhovskaya's experience as a settlement administrator does not make her any more qualified than a lay person to decide whether two names match. In any event, Verkhovskaya has no data to compare at this point because she has not performed the proposed reverse-append search through LexisNexis.

### III.    VERKHOVSKAYA'S CONCLUSIONS ARE BASED ON INSUFFICIENT FACTS AND DATA BECAUSE SHE RELIES ON THIRD PARTY DATABASE SEARCHES THAT HAVE NOT BEEN PERFORMED.

Only if the proposed class is certified would Verkhovskaya send the telephone numbers SGS called to LexisNexis (Verkhovskaya Report, ¶¶ 61-67, Ex. C). Verkhovskaya offers no explanation as to why it would not be feasible to perform the reverse-append search through LexisNexis prior to class certification. Had Verkhovskaya actually completed this work, SGS would be able to analyze the results from LexisNexis and Verkhovskaya's name matching process for accuracy. It is axiomatic that non-existent data cannot be tested or verified by Verkhovskaya, SGS, or the Court.

Carroll may not merely propose a method of ascertaining a class but must show that the method would succeed as applied to the facts in this case. *See Carrera v. Bayer*, 727 F.3d at 306-07 and 311, and *Hunter v. Time-Warner Cable, Inc.,* 2019 LEXIS 137495 (S.D. N.Y. Aug. 14, 2019). Verkhovskaya provides no assistance to Carroll in this regard because the work she proposes has not been performed.

The fact that Verkhovskaya has not seen the results of LexisNexis performed reverse-append searches for this case does not discourage her from attesting to the accuracy of the yet to be seen data. According to Verkhovskaya, the accuracy of the LexisNexis data always varies "+/- 7%." (Verkhovskaya dep., p. 126, Ex. C). This admitted data failure rate is based on unidentified "testing" performed years ago by while Verkhovskaya was employed by AB Data; *Johnson v. Navient* dep., pp. 28-29, Ex. M). Conveniently, Verkhovskaya does not have access to this "test data" and therefore cannot produce it to allow SGS to traverse it. (Verkhovskaya dep., p. 116, Ex. C). Even Verkhovskaya concedes that the "testing" was neither scientific nor statistically valid. (Verkhovskaya dep., Luster v. Green Tree, p. 46, Ex. G). This Court should not "admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert. A court may conclude there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d. 508 (1997). Here, there is literally zero proof or data supporting Verkhovskaya's claims of the accuracy or failure rates of the reverse-append process. Verkhovskaya's *ipse dixit* does not satisfy the Rule 702 standard for admissibility.

IV. **NEITHER LEXISNEXIS NOR ANY OTHER THIRD PARTY DATABASE CAN RELIABLY DETERMINE THE USER OR SUBSCRIBER ASSIGNED TO A TELEPHONE NUMBER AT A SPECIFIC TIME**

    A. **LexisNexis disclaims the accuracy of its own database.**

LexisNexis disclaims the accuracy of database services it sells, and its public disclaimer is readily available on its website. Nevertheless, Verkhovskaya has often denied that the disclaimer applies to the "product" LexisNexis makes available to her. (Verkhovskaya dep., *Gilmore v. USCB,* pp. 102-103, Ex. N).

Verkhovskaya's testimony in this case should put an end to this charade. SGS issued a subpoena for CEG's contract with LexisNexis. (SGS Subpoena, Ex. O.) Verkhovskaya finally

produced the contract when pressed to do so during deposition. (Verkhovskaya dep., p. 90-97, Ex. C). The contract is entitled "Non-FCRA Permissible Use Certification" and is dated March 14, 2019. (Contract, Ex. P). The contract explicitly states that the agreement is subject to the "Terms and Conditions" found at www.lexisnexis.com/risk/Documents. (Ex. Q, p. 4). Contrary to what she testified in *Gilmore*, Verkhovskaya finally admitted that these LexisNexis Terms and Conditions apply to both her and her firm. (Verkhovskaya dep., Ex. C, pp. 206-207).

The LexisNexis Terms and Conditions contain the following **DISCLAIMER OF WARRANTIES**:

> LN DOES NOT MAKE AND HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED WITH RESPECT TO THE LN SERVICES, LN DOES NOT WARRANT THE CORRECTNESS, COMPLETENESS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE LN SERVICE OR INFORMATION PROVIDED THEREIN. Due to the nature of public record information, the public records and commercially available data sources used in the LN Services may contain errors. **Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. The LN services are not the source of data, nor are they a comprehensive compilation of the data. Before relying on any data, it should be independently verified.**

(LexisNexis Terms ¶ 12. Ex. Q) (emphasis added).

The LexisNexis public repudiation of its own database, relied upon by Verkhovskaya for identifying the user or subscriber associated with a telephone number to ascertain class membership, speaks for itself, and was a key issue in *Hunter v. Time Warner Cable, Inc.*, 15-CV-6445, 2019 U.S. Dist. Lexis 137495 (S.D. N.Y. August 14, 2019). Colin Weir, plaintiff's expert in *Time Warner*, proposed the use of LexisNexis reverse-look up data to ascertain TCPA class members. (*Id.* at *29-30).[8] In rejecting the reverse-append methodology, that court relied on

---

[8] Verkhovskaya was also an expert for the plaintiff in the *Time Warner* case.

LexisNexis's statements disavowing the reliability of the service for the purpose proposed. The court stated:

> But representatives from LexisNexis disclaimed the data's capacity to fulfill this purpose. With respect to the particular product used by plaintiffs' experts, one LexisNexis representative averred that it 'cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was 'reassigned' from one person to another, or when the 'customary user' of a phone number changed.'

*Id*. at *30.

The *Time Warner* court further found that these reliability issues applied equally to other third party databases as well. The court stated:

> Other reverse-look up database providers acknowledge similar short comings in their products and the FCC has expressly recognized that 'commercial databases' that track phone number assignment 'are not comprehensive.' *Advanced Methods to Target and Eliminate Unlawful Robocall*s, Second Report and Order, CG Docket No. 17-59, FCC 18-177, ¶ 6, 64 (Dec. 13, 2018), https://docs.fcc.gov/public/attachments/FCC-18-177A1.pdf. (*Id*. at *31) (Docket citations omitted).

Other courts have similarly rejected the use of such reverse-append tools to identify the users of particular phone numbers for the sake of determining class membership. *See*, *e.g., Jacobs v. Quicken Loans, Inc.*, No. 15 CIV. 81386, 2017 U.S. Dist. LEXIS 176469, 2017 WL 4838567, at *3 and n. 4 (S.D. Fla. Oct. 19, 2017); *Sherman v. Yahoo! Inc.*, No. 13 CIV. 41, 2015 U.S. Dist. LEXIS 127809, 2015 WL 5604400, at *6 (S.D. Cal. Sept. 23, 2015) ("plaintiff's belated proposal to use a reverse lookup also does not provide objective, verifiable criteria for identifying class members."); *Balshmiter v. T.D. Auto Fin. LLC*, 303 F.R.D. 508, 524-25 (E.D. Wis. 2014) (noting the inaccuracies of reverse lookup services and concluding that the use of such services alone could not adequately ascertain class members).

### B.    Specific cases demonstrate that Verkhovskaya cannot accurately identify historic telephone subscribers and users using third party databases.

Verkhovskaya can produce no objective facts to verify her claim that LexisNexis accurately identifies historic telephone subscribers and users within a failure rate of 7% (or much worse), which even if true proves her method is unreliable. Application of her methodology in her other cases demonstrate that she is unable to objectively, consistently, and reliably solve the systemic problem of identifying historic subscribers and users of telephone numbers. Verkhovskaya acknowledges her methodology sometimes yields "multiple hits" – situations where records associated with a phone number identify multiple individuals. (Verkhovskaya dep., p. 175, Ex. C).

A telephone number previously used personally by Verkhovskaya demonstrates the inherent problems with reliance on third party databases. Verkhovskaya testified that a telephone number ending in 4403 was hers only until 2017 or 2018. But third-party services still identify Verkhovskaya as the current user of this number. (Woolfson Affidavit, ¶¶ 28-31, Ex. B).

Two federal courts have criticized Verkhovskaya's reverse-append methodology when the process proved incapable of identifying even the named plaintiff in putative class actions under the TCPA. *See Wilson v. Badcock Home Furniture,* 329 F.R.D. 454, 457 (N.D. Fla. 2018)(explaining that Verkhovskaya's analysis did not identify the named plaintiff as a class member without individualized inquiry); October 23, 2019 Memorandum & Order, *Sandoe v. Boston Scientific Corp.,* Civ. Action No. 18-11826 (D. Mass.). (Attached hereto as Ex. R). (Verkhovskaya could not identify the class representative without application of a "six-month fuzzy period and by virtue of individual testimony or analysis of plaintiff's phone records"). The court in the *Wilson* case also noted that Verkhovskaya was only able to identify the plaintiff as a class member in another case (*Amber Goins v. Palmer Recovery Attorneys, PLLC)* based on

Verkhovskaya's own knowledge about the individual plaintiff and through a search of a wedding registry page. *Wilson*, at 457. Class certification was denied in the *Wilson, Sandoe,* and *Goins* cases.

    **C.    A Test Sampling of 200 phone numbers called by SGS proves Verkhovskaya's LexisNexis methodology is unreliable.**

For purposes of the Daubert motion, Aaron Woolfson, SGS's expert, randomly chose 200 phone numbers called by SGS (100 wireless and 100 landline phone numbers) from Verkhovskaya's Output REQ list for submission to LexisNexis for reverse-append searching. The output data were reviewed by Mr. Woolfson; the results are described in his Affidavit (Ex. B) and summarized below:

- LexisNexis associated no names with 15% of the numbers on the dates of the calls.

- LexisNexis associated more than one person with almost 45% of the numbers on the dates of the calls, with many numbers having 3 or more associations.

- Of the 82 numbers associated with only 1 name, 13 listed a name completely different from (that is, neither the first nor last name matched) the lessee.

- The reverse-append search result provided a direct link between the named lessee and the number SGS called, when the call was made, less than 35% of the time.

The reverse-append search result provided a direct link between the named lessee and the This sampling calls into serious doubt Verkhovskaya's claim that the "error rate" of the LexisNexis database is only 7%. In sum, this test sample using the LexisNexis data clearly demonstrates that Carroll cannot accurately ascertain the members of the proposed class using Verkhovskaya's methodology.

    **D.    Verkhovskaya's "fuzzy match" methodology is entirely subjective.**

When her LexisNexis reverse-append searches produce conflicting data points (*e.g.,* multiple associations), Verkhovskaya: makes an "expert" decision on how to handle those conflicts. (Verkhovskaya dep., pp. 27-28, Ex. C); and uses a "name matching software" that will

sometimes provide a match and resolve the conflicting points in the LexisNexis data (Verkhovskaya dep., p. 182, Ex. C). She has offered no information regarding the reliability of the "name matching software." It does not appear that her mysterious "name matching software" has ever been independently tested or used by any other expert. (Verkhovskaya dep., p. 171, Ex. C).

In some instances, the "name matching software" produces a "fuzzy match." (Verkhovskaya dep., pp. 182-183, Ex. C). At that point, Verkhovskaya and her staff make a case-by-case determination by manually reviewing the records and making "judgment calls based on our knowledge and expertise." (Verkhovskaya dep., p. 183, Ex. C). But, by definition, judgment calls are subjective, and subjective decisions are based on or influenced by personal feelings, tastes or opinions. See, Merriam-Webster.com.

There is nothing scientific, specialized, or technical about Verkhovskaya's "fuzzy match" methodology. Instead, it looks more like a guessing game. This is precisely the kind of non-verifiable "expert" analysis *Daubert* prohibits.

**V.    ERRORS IN VERKHOVSKAYA'S WORK PRODUCT DEMONSTRATE THAT THE DATA HANDLING PERFORMED WAS NOT RELIABLY APPLIED TO THE FACT OF THE CASE.**

Verkhovskaya maintains that CEG employs "very stringent quality assurance procedures." (Verkhovskaya dep., at 123, Ex. C). Data integrity was described by Verkhovskaya as "super" and "critically" important. (Id. at 187, Ex. C). Nevertheless, her data report is replete with errors and is undependable.

Verkhovskaya claimed that CEG filtered out all toll-free numbers. The CEG data shows otherwise. (Woolfson Affidavit, ¶ 13, Ex. B; Verkhovskaya dep., p. 189, Ex. C). The CEG SQL data identifies calls as being made to a work number whereas the original SGS Call Logs show the calls were made to home numbers. (Woolfson Affidavit, ¶¶ 14-15, Ex. B; Verkhovskaya dep., p. 193, Ex. C). Correspondingly, the CEG data shows calls made to a work number when the calls

were in fact "left message at home." (Woolfson Affidavit, ¶ 16, Ex. B; Verkhovskaya dep., p. 202, Ex. C). In her report, Verkhovskaya stated that she was able to determine the duration of each call based upon her review of a specific column of the data provided by SGS. (Verkhovskaya dep., pp. 64-65, Ex. C). But call duration cannot be ascertained from the SGS database. (Woolfson Affidavit, ¶ 32, Ex. B). These examples of mistakes in Verkhovskaya's own data underscore the untrustworthy nature of her "data analysis."

Verkhovskaya conceded that her data errors needed to be investigated. (Verkhovskaya dep., p. 194, Ex. C) But she was somehow confident that her investigation would not change her opinions or conclusions (Verkhovskaya dep., p. 233, Ex. C). After her deposition, Verkhovskaya "corrected" her expert report and data. She now claims that the "wireless class" has increased by 3,490 (59,089-66,579-) whereas the "left message at home" class has decreased by 33,016 (89,124-56,108). In sum, with even the limited data handling she has performed, Verkhovskaya has failed to apply her methodology reliably to the facts of this case.[9]

## VI.   MISREPRESENTATIONS BY VERKHOVSKAYA REGARDING A RULING BY THIS COURT AND OTHERS WARRANT EXCLUSION OF VERKHOVSKAYA'S TESTIMONY.

On September 6, 2019, Verkhovskaya signed a report as an expert for the plaintiff in *Wright v. EXP Realty, LLC*, Case No. 6:18-cv-01851 (M.D. Fl.). (Verkhovskaya's *Wright* Report, Ex. R). Verkhovskaya represented:

> **Courts have regularly approved of my own use of IMS data as a reliable means of identifying calls made to wireless telephone numbers.** *See, Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc. and Alarm.com Holdings, Inc.,* No. 15-6314 (N.D.Cal.); *Berman v. Freedom Financial Network, LLC,* No. 18-1060 (N.D.Cal.); ***Carroll***

---

[9] Verkhovskaya's attempt to issue these corrections using her deposition errata sheet is impermissible under Fed. R. Civ. P. 30(e). *Greenway v. Intl. Paper Co.,* 144 F.R.D. 322, 325 (W.D. La. 1992)("The [30(e)] Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.").

>*v. SGS North America, Inc.,* **No. 16-00537 (N.D.LA)**; *Clough v. Revenue Frontier, LLC, et al* , No. 17-00411 (D.N.H.); *Hopkins v. Modernize, Inc.*, No. 17-40087 (D.Mass.); *McMillion v. Rash Curtis & Associates*, No. 16-03396 (N.D.Cal.); *Youngman v. A & B INS & FIN, Inc.,* No. 16-01478 (M.D.Fla.).

(Verkhovskaya's *Wright* Report, ¶44, Ex. R) (emphasis added).

Verkhovskaya's statement to the federal court in Florida that this Court "approved" the use of IMS data is false. Her statements regarding the other cases appear to be equally without merit. Counsel for SGS reviewed the docket report and pleadings in the other cases cited by Verkhovskaya in *Wright* to enhance her qualifications. From a review of the record in *Abante Rooter, Berman, Clough, Hopkins,* and *Youngman,* counsel for SGS was unable to identify any order, ruling, or pleading in which the court approved of Verkhovskaya's use of IMS data as a reliable means of identifying calls made to wireless numbers. In addition, SGS's counsel contacted defense counsel in the *Berman, Youngman* and *Clough* cases. None of the defense counsel contacted was aware of any court approval consistent with Verkhovskaya 's representation in the *Wright* case.

SGS's counsel was able to confirm that Verkhovskaya testified at trial on May 8, 2019 in the *McMillion v. Rash Curtis* case. In her direct examination, Verkhovskaya testified that IMS can be used to identify whether a telephone number was wireless at the time of a specific call. (Verkhovskaya transcript, *McMillion v. Rick Curtis*, Doc 255, p. 126, Ex. H). Undersigned counsel are unable to identify anywhere in the record that the *McMillion* court "approved" the reliability of the IMS data other than the fact that Verkhovskaya was allowed to testify.

Not surprisingly, courts typically consider an expert's misrepresentations to be a serious transgression. *See, e.g., In re: Vioxx Prods.*, 489 F. Supp. 2d 587, 591-94 (E.D.La. 2007); *In re: WRT Energy Corp.*, 282 B.R. 343, 371 (Bkrtcy. W.D.La 2001). Accordingly, SGS reject Verkhovskaya as an expert witness in this matter.

Respectfully submitted this 25th day of October, 2019.

          MCGLINCHEY STAFFORD, PLLC

          */s/ Daniel T. Plunkett*
          DANIEL T. PLUNKETT (#21822)
          601 Poydras Street, Suite 1200
          New Orleans, LA 70130
          Telephone: (504) 586-1200
          Facsimile: (504) 596-2800
          Email: dplunkett@mcglinchey.com

          and

          C. KIEFFER PETREE (#31206)
          301 Main Street, Suite 1400
          Baton Rouge, LA 70801
          Telephone: (225) 383-9000
          Facsimile: (225) 343-3076
          Email: cpetree@mcglinchey.com

          *Attorneys for SGS North America Inc., improperly named as SGS Automotive Services, Inc.*

## CERTIFICATE OF SERVICE

  I certify that on October 25, 2019, a copy of this pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's CM/ECF system.

          */s/ Daniel T. Plunkett*
          DANIEL T. PLUNKETT (#21822)