# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TAYLOR CARROLL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br>Plaintiff, | * CIVIL ACTION NO. 3:16-cv-00537-<br>* SDD-RLB<br>* |
| VERSUS | * JUDGE SHELLY D. DICK<br>* |
| SGS AUTOMOTIVE SERVICES, INC.,<br>Defendant. | *<br>*<br>* MAGISTRATE RICHARD L.<br>* BOURGEOIS, JR. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Carroll alleges SGS violated the TCPA telemarketing rules when it left pre-recorded messages to schedule lease-end car inspections. Carroll's Motion (containing a new definition of the proposed classes – Version 4.0 Class Definition),[1] contends the Court need look no further than SGS's own records to satisfy the requirements for certification under Rule 23. In doing so, Carroll runs away from the contrary opinions of his expert, Anya Verkhovskaya.

SGS denies that the claims can or should be litigated as a class action because:[2]

- **Carroll's own expert contradicts the theory that class members can be reliably ascertained based on SGS's records.** SGS's call logs identify the individuals SGS intended to call but not who SGS actually called. So Verkhovskaya opined that identifying call recipients required a "reverse-append-search" of LexisNexis's constantly changing database.[3] Then Verkhovskaya would cross-check the results with SGS's records.[4] After SGS demonstrated that this process is inherently unreliable, Carroll now abandons Verkhovskaya's methodology, claiming that SGS's records alone are sufficient.

---

[1] See "Attachment A" for the history of Carroll's actual and purported class definitions. SGS is unfairly prejudiced by this new iteration of the class definition which came after the close of discovery and does not waive its prior objection to the amendment of the class definition. *See* Dkt. 188, 189.

[2] In addition to the arguments raised below, there are several unresolved motions that, if granted, would preclude litigating this matter as a class action. *See* "Attachment B" containing a list of the unresolved motions that affect whether a class can be certified.

[3] *See* Dkt. 180-15 at 210.

[4] *Id.*

- **Carroll seeks to lead this Court into believing that SGS admitted that its records are the "best evidence that a pre-recorded message was left with a particular telephone number."**[5] This is a misrepresentation, plain and simple. The SGS deponent only agreed that the SGS call list database showing "the disposition 'left message' is the best evidence that you–all have of whether or not the message was left to a particular lessee or a particular number?"[6] Carroll's omission now of the words "**that you all have**" gives a false impression of the actual testimony.

- **Carroll himself defeats the argument that SGS's records are the "best evidence" of who was called.** SGS did not intend to call Carroll. Instead, Carroll received "wrong number" calls intended for his wife. The name associated with the telephone number in SGS's records is Cindy Carroll because, in an effort to secure more favorable financial terms, she provided her husband's cellular phone number rather than her number as her "Home" number.[7] Reliance on Verkhovskaya's deeply-flawed interpretation of third-party data (which Carroll now disavows and which is inherently unreliable) is the only means of associating SGS's "wrong number" calls with Carroll.

- **An individualized inquiry will be required to determine whether an artificial or pre-recorded voice actually played on a call.** It is impossible to determine on a class-wide basis whether a pre-recorded message played on any given call – only that it **might** have played.[8] This information cannot be discerned from SGS's records or Verkhovskaya's methodology. Due to the absence of such common evidence, SGS is entitled to present a defense to every call.

- **Carroll's claims are not typical of the proposed class members' claims.** After discovery closed, Carroll claimed for the first time that class members can be identified solely from SGS's records. However, only Honda lessees are identifiable from SGS's records. Carroll, who was not a lessee, has made himself atypical of the class as, unlike lessee class members, he was not an intended recipient of SGS's calls.

- **A class action is neither manageable nor a superior mechanism.** The complexities are exacerbated because it is impossible to determine from SGS's records alone who SGS actually called and whether a message actually played. Discovery would have to be reopened. Countless mini-trials would be required on individualized issues for class members.

---

[5] Dkt. 180-1 at 3, 9.

[6] Dkt. 180-4 at 72; *see also* Declaration of Keith Phillips, "Attachment C" at ¶¶ 11-12.

[7] Dkt. 26-7 at 8; Dkt. 30-1; 30-3 at 5-9; Dkt. 40 at 1.

[8] *See, e.g., Roberts v. Medco Sols.,* 2016 U.S. Dist. LEXIS 97177 (E.D. Mo. July 26, 2016) ("Because a call in which a prerecorded voice "might, but does not, play' does not trigger violation of the TCPA, any calls that were blocked by the call-blocking application do not constitute violations and are not at issue here").

The Court should deny class certification, "joining the 'chorus of other courts faced with TCPA class actions that have found such individualized inquiries . . . to preclude class certification.'" *Hunter v. Time Warner Cable,* 2019 U.S. Dist. LEXIS 137495 (S.D.N.Y. 2019).

### CLASS DEFINITION STILL RELIES ON UNRELIABLE METHODOLOGY

SGS's call logs reflecting who SGS <u>intended</u> to call were produced in April 2017. Fifteen months later, Carroll filed his Third Amended Complaint with the operative class definition (the "Governing Definition").Thereafter, Carroll retained Anya Verkhovskaya as an expert witness to proffer a methodology (called a "reverse append search") by which she claims she can link the number called to the actual recipient of the call. On December 17, 2018, four months after the Third Amended Complaint, Verkhovskaya issued her report describing the reverse append process using a third party database to identify who received calls from SGS and, for non-cellular numbers, whether the number was a residential or business line. Verkhovskaya presented this append process as essential for Carroll to ascertain the identities of members of any class.

At no point did the Governing Definition, Verkhovskaya's report, or her deposition suggest that the actual recipient of a call could be identified based on SGS's call logs. In fact, Verkhovskaya's methodology[9] assumed that it is not feasible to reliably ascertain class members from the call logs.[10] Carroll, acknowledging the unreliability of SGS's records for ascertaining class members, argued on November 15, 2019 that Verkhovskaya's methodology was reliable and the call logs would only provide corroboration. (Dkt. 142 at 7). Accordingly, Carroll did not retain any expert to validate SGS's system's reliability to identify the actual recipients of calls. And there was no meaningful discovery into the reliability of Status ID Codes to establish (1) that the calls

---

[9] *See, e.g.,* Dkt. 180-15 at 210 (agreeing that her methodology is designed to identify call recipients).
[10] In fact, Verkhovskaya testified that she has acted as an expert in "wrong number" cases where the defendant was in the financial industry and the calls included wrong numbers. Dkt. 180-15 at 18.

were received, and (2) whether a pre-recorded message actually played.[11] Instead, Carroll disguises argument as expert testimony.[12]

But since Verkhovskaya's deposition, during which the unreliability of her process was exposed,[13] Carroll has presented the Court with three new proposed class definitions that have one thing in common - an attempt to distance Carroll from Verkhovskaya's unreliable methodology.[14] First, Carroll proposed Version 2.0 Class Definition, which relied on AHFC credit applications. (Dkt. 121). When SGS noted that the applications were not readily accessible (Dkt. 134), Carroll proposed Version 3.0 Class Definition which removed the credit applications from the definition, but still relied on them for ascertainability. (Dkt. 147-1 at 3) ("every class member originally provided a telephone number in an AHFC credit application"). SGS identified the futility and unfair prejudice of Version 3.0. (Dkt. 165) So Carroll proposed yet another class definition in his

---

[11] Wildly out of context, Carroll states that "[j]urisprudence prohibits a defendant from challenging class certification by questioning the accuracy of its own record keeping." Dkt. 180-1 at 22-23. But SGS is not challenging the accuracy of its records in asserting that they do not establish the recipient of a call or prerecorded message. The records accurately reflect only what they were intended to reflect: who SGS intended to call and how. But no matter how accurate SGS's records, it would never have known, for example, that the calls intended for Cindy Carroll actually went to Taylor Carroll. Similarly, no call log can predict whether anyone (let alone who) would hear a prerecorded messages left on voicemail. No case cited by Carroll demands otherwise. *See, e.g., Mullins v. Direct Digital*, 795 F.3d 654 (7th Cir. 2015) (finding Court has discretion to allow other evidence and mechanisms to verify the information to avoid "the significant harm caused by immunizing corporate misconduct"); *Reyes v. BCA Fin. Svcs.*, 2018 U.S. Dist. LEXIS 106449 (S.D. Fla. 2018) (in wrong-number TCPA case, finding limitations in bank's record keeping did not preclude certification (but bank lacked any evidence that a single entry was inaccurate - unlike here where wrong-number calls are known to exist), but also explaining that "Reyes is not proposing to rely solely on BCA's records to identify class members"). In fact, the weight of the case law actually reaches the opposite conclusion. *See, e.g., Hayes v. Wal-Mart Stores*, 725 F.3d 349, 356 (3rd Cir. 2013) ("the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements"); *Sliwa v. Bright House*, 2019 U.S. Dist. LEXIS 167805, at *55 (M.D. Fla. 2019) (denying certification in wrong-number TCPA case, explaining "[d]etermining whether these BP Codes indicated a wrong number was called can only be resolved on an individual basis, and Defendants' imprecise record keeping does not preclude the required individualized inquires").

[12] *See, e.g.,* Dkt. 180-1 at 23 ( "Membership in the class can be further delineated by eliminating calls with Status ID codes (1401, 1501 and 1601) for phone numbers that are 'no good.'") Carroll merely cites a response to an interrogatory identifying codes that could be entered into the Status ID column to support this proposition, not what those codes actually mean, how they are used, how they are generated, or whether they are reliable. Carroll does not cite to Verkhovskaya because she rendered no such opinion. Moreover, SGS's expert's opinion makes clear that Carroll's lay opinion is incorrect. *See generally* Woolfson Declaration, "Attachment D."

[13] *See infra* at n.59.

[14] *See* Attachment A. Presumably, Carroll is also attempting to distance himself from Verkhovskaya's history of misrepresentations, including that this Court (in this case) approved her use of IMS data already. *See* Dkt. 126-1 at 17-18.

Second Motion to Certify ("Version 4.0 Class Definition"). (Dkt. 180-1).

Significantly, Verkhovskaya's opinions were still based on the Governing Definition.[15] But in Version 4.0 Class Definition, Carroll again distanced himself from the flawed reverse append search and from Verkhovskaya.[16] Now, Carroll contends that the class can be ascertained from SGS's records, despite his name never appearing in those records. Carroll could only be found by resorting to unreliable third-party data[17] or his own testimony - testimony that is unavailable for every other class member.[18] Although the call logs may be the best evidence <u>SGS has</u> as to the intended recipient of its prerecorded messages, that does not mean SGS is somehow able to divine the unknowable and determine who was on the other end of the line.

For the first time,[19] Version 4.0 Class Definition removed the requirement that class members "<u>received</u>" the pre-recorded message.[20] Presumably the new reference to Status ID codes

---

[15] Carroll's contention that Version 4.0 is not materially different than the Governing Definition is merely his conjecture and is incompatible with the changing scope of the class. *See supra* at n.1. SGS's expert has stated that the changes to the class definition would have led him to conduct a different expert review. *See* Attachment D at ¶¶ 2-7.

[16] The flaws in Verkhovskaya's opinions, including her lack of expertise, expert analysis, reliance upon admittedly unreliable third party databases, unwarranted case-by-case subjective conclusions, and demonstrated errors in handling the relevant data, are addressed in detail in SGS's Motion to Exclude Class Expert (Dkt. 126) which is incorporated by reference herein. *See also* Attachment D and Woolfson's *Daubert* Affidavit, "Attachment E." In fact, even Verkhovskaya's belated attempt to correct prior errors in her report by way of an errata sheet to her deposition contains an error. *See* Attachment D at ¶ 32.

[17] *See* Attachment E at ¶¶ 25-27 (finding that in a sample of 200 numbers, 41% were associated with only one name, while 15.5% were not associated with any names and 43.5% were associated with multiple (as many as eight) names). Finding Carroll through the reverse append search merely establishes that it can produce correct results some of the time. *See id.* at ¶¶ 28-31 (finding Verkhovskaya listed as the current owner of a telephone number she has not owned in over a year).

[18] Cindy Carroll, the lessee, would be identified as the person who received those calls based upon SGS's records since the Carrolls provided his telephone number as hers in order to get better financial terms. It naturally follows that many other members of the class in a similar situation (with one spouse having better credit than the other) would also have misrepresented the lessee's telephone number to get improved financial terms. Carroll lacks any evidence to suggest his misrepresentation is isolated and unique within the class.

[19] The Second Amended Complaint defined the class as "[a]ll persons . . . to whom a telephone call was initiated or placed by SGS," but did not require actual receipt. Dkt. 47. This change accounted for the obvious fact that the intended recipient does not possess the claim. *See, e.g., Osorio v. State Farm*, 746 F.3d 1242, 1252 (11th Cir. 2014).

[20] Version 4.0 Class Definition identifies the classes as those "to whom" SGS made an artificial or prerecorded telephone message from its dialing system. This is different than the Governing Definition which limited the class to those "who received an artificial or prerecorded message . . ." *See* Attachment A. Carroll leaves vague whether he is defining the class as the **intended recipients** or the **actual recipients**. He proposes a process to ascertain the class which would exclusively identify the **intended recipients**, but subsequently states that all class members **<u>received</u>** calls - meaning the class is intended to be the **actual recipients** Dkt. 180-1 at 3, 7. This ping pong between **actual**

in Version 4.0 is intended to supplant the word "received." Carroll then mischaracterizes testimony

to contend the Status ID codes establish whether a call was received and that the pre-recorded

message played.[21] Verkhovskaya offers no opinion whether those Status ID codes are a reliable

indicator that a call connected and the prerecorded message was received. Carroll's class definition

no longer requires receipt because no one knows who received the prerecorded messages other

than the actual recipients themselves.

Carroll claims that all class members received six to nine prerecorded messages, meaning

it would be necessary to determine who received pre-recorded messages, and how many, before

deciding if they would be a class member.[22]

Just as Verkhovskaya's methodology is fatally flawed and incapable of reliably

ascertaining the putative class members, so is Carroll's sudden reliance upon SGS's call records.[23]

---

recipient and intended recipient continues throughout the Motion because intended recipients of the messages (the lessees), although ascertainable from SGS's records, may not have a claim under the TCPA, while actual recipients are not ascertainable but would be capable of possessing a claim under the TCPA (prior to considering other defenses). Carroll vacillates between the two depending upon the argument being made. However, Carroll must confine himself to a class of actual recipients for the simple fact that he would not even be a member of the class if "to whom" was read to mean the intended recipient.

[21] Dkt. 180-1 at 3, 9 (Asserting that "SGS also admits it call detail records constitute the 'best evidence' of whether or not a prerecorded message was left with a particular lessee or telephone number."). However, SGS's representative actually testified that the call logs are the best evidence **SGS possesses** of whether a message was left to a particular lessee or a particular number. Dkt. 180-4 at 72; see also Attachment C at ¶¶ 11-12. Not only does this testimony not support the conclusion that the call logs are the best evidence of whether a message was left for a particular lessee, but it is also subject to the obvious limitation that SGS has no way of knowing who was on the other end of the line when it played a pre-recorded message. Id. at ¶¶ 13-15.

[22] Carroll states that in addition to two recordings (for which he transcribes the recordings in his Motion), "[a]ll class members received an additional four to seven prerecorded telephone messages . . . These are the only 'artificial or prerecorded messages' referenced in the class definitions that are at issue in this case." Dkt. 180-1 at 8. Since Carroll has limited his class to those individuals that received six to nine prerecorded telephone messages, possibly to avoid issues with typicality or Article III standing, his proposed class is much smaller than he claims. For example, SGS's expert reviewed the data for the 62,579 wireless numbers identified by Verkhovskaya, and more than 25% of them had only **one** call initiated by SGS and another 37% only had two or three initiated calls reflected. See Attachment D at ¶ 31.

[23] A combination of the two fares no better. First, cross-referencing two pieces of unreliable information does not create reliable information. Moreover, Carroll has not proposed any mechanism to determine which phone numbers require his expert's reverse-append method to determine if the actual recipient matches the intended recipient reflected in SGS's records. Since there is no way to determine the actual recipient from SGS's records, reliance on third party information or testimony from the actual recipient would be necessary. Carroll is not even consistent on the volume of numbers for which this determination would be required. The precise figure is unclear as Carroll has stated in his Motion, contrary to his expert and without relevant citation, that 150,625 unique telephone numbers received 680,594

6

**ARGUMENT**

Carroll's proposed classes implicate the TCPA provisions governing prerecorded messages to cellphones or residential landlines without proper consent.[24] If the call constitutes "telemarketing," then FCC regulations require prior express written consent.[25] Carroll includes the telemarketing component as an element of both proposed classes. (Dkt. 180-1 at 4.)[26] To paraphrase, the "Pre-Recorded Message Class" includes those who received a call from SGS with a prerecorded message that actually played at either the called party's cellphone or residential (non-business) landline. The "Cell Phone Class" is limited to calls made to cellphones without regard for whether they are used for business purposes and requires the use by SGS of an ATDS.[27]

**A. Carroll's Proposed Classes are not Ascertainable.**

Ascertainability is an "implied prerequisite of Rule 23." *Natl. Sec. Fire and Cas. Co.*, 501

---

calls where a prerecorded message was played. *See* Dkt. 180-1 at 13. However, Verkhovskaya states that there were 62,579 wireless numbers and 56,108 non-wireless numbers with the total number of calls where prerecorded messages played being 549,299 - 130,000 fewer calls than alleged by Carroll. Dkt. 180-16 at 1; *see also* Dkt. 119-1 at 11-12 (Carroll previously relied upon Verkhovskaya's figures, resulting in this Motion asserting that the class is 27% larger and received 24% more calls than he claimed in his prior motion for class certification). Moreover, Verkhovskaya's conclusions on the call volume are not supported by the data she produced. The calls to 56,108 non-wireless telephone numbers she references are all included in the 280,510 wireless calls she identified. *See* Attachment D at ¶ 32. The result of this error being that Verkhovskaya identified 280,510 calls to wireless numbers and zero calls to non-wireless numbers, making her results some 400,000 calls less than Carroll's unsubstantiated contention of 680,594 calls.

[24] *See* 47 U.S.C. § 227(b)(1)(A)(iii).

[25] *See* 47 C.F.R. § 64.1200(a). Carroll contends that this Court previously found that the pre-recorded messages had a dual purpose of telemarketing. Dkt. 180-1 at 6. In addition, he asserts that this Court has already found SGS to have used an ATDS and that SGS lacked consent to make the calls at issue. *Id.* at 6, 9. Based upon his "summary of elements," the only undecided element is whether SGS sent a prerecorded message to a cellular telephone or a non-business residential landline *Id.* at 4. This implicates one-way intervention which generally bars certification after a ruling on the merits because, otherwise, "members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests." *Am. Pipe & Constr. v. Utah*, 414 U.S. 538, 545-47 (1974); *see also* Dkt. 117-1 at 18-20 (in summary judgment motion addressing one-way intervention as a problem). Here, Carroll claims he can accurately ascertain the recipients of prerecorded messages on cell phones and non-business landlines and provide notice to these individuals. Dkt. 180-1 at 25. Therefore, according to Carroll, everyone that receives notice will have already prevailed.

[26] The telemarketing component is in apparent recognition that all telephone numbers voluntarily furnished to AHFC by customers would constitute express consent for non-telemarketing or non-dual purpose calls. *See, e.g., Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012) (collecting cases).

[27] Carroll provides no expert testimony regarding SGS's dialing system - a fatal deficiency to the Cell Phone Class. *See, e.g., Glasser v. Hilton Grand*, 2020 U.S. App. LEXIS 2481, at *2-4 (11th Cir. Jan. 27, 2020) (finding that two dialing systems were not ATDSs because they did not "use[] randomly or sequentially generated numbers" and separately because one "required human intervention," regardless of whether they "had the capacity to automatically dial a stored list of telephone numbers).

F.3d 443, 445 (5th Cir. 2007); *Plaza 22 v. Waste Mgmt. of La.,* 2015 U.S. Dist. LEXIS 30405, at

*9 (M.D. La. 2015) ("[t]he class 'definition must be precise, objective, and presently

ascertainable'").[28] Carroll concedes his burden[29] is to establish that the class is ascertainable and

that it is "administratively feasible for the court to determine whether a particular individual is a

member of the proposed class."[30] (Dkt. 180-1 at 21) quoting *Sartin v. EKF Diagnostics, Inc.,* 2016

WL 7450471, at *18 (E.D. La. Dec. 28, 2016).[31]

Not only does this require identifying the actual recipient of each call, but also whether

anyone listened to the message. *See, e.g., Flecha*, 946 F.3d 762, 2020 U.S. App. LEXIS 481, at

*12 (5th Cir. Jan. 8, 2020) ("there are undoubtedly many unnamed class members here who lack

the requisite injury to establish Article III standing. . . the putative class inevitably includes people

who received the letter, but ignored it as junk mail or otherwise gave it no meaningful attention -

---

[28] *See also EQT Prod. Co. v. Adair*, 764 F.3d 347, 358-59 (4th Cir. 2014) ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria. . . . "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.") (citing *Marcus v. BMW*, 687 F.3d 583, 593 (3rd Cir. 2012)); *see also* 7A Charles Alan Wright et al., Federal Practice & Procedure § 1760 (3d ed. 2005) ("[T]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.").

[29] *See, e.g., Hayes*, 725 F.3d at 356 ("plaintiff must show by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class"); *see generally LeBlanc v. Exxon Mobil*, 2015 U.S. Dist. LEXIS 32533 (M.D. La. 2015) (denying class certification where the task of ascertaining class members was not a simple matter of identifying purchasers of the gas, but also whether they experienced uselessness or inconvenience - requiring individual inquiries).

[30] Moreover, the number of class members ascertained must be sufficiently numerous and rooted in actual evidence. "[M]ere speculation as to the number of class members—even if such speculation is a bet worth making—cannot support a finding of numerosity." *Mielo v. Steak 'N Shake Ops., Inc.*, 897 F.3d 467, 486 (3rd Cir. 2018) (rejecting the plaintiffs' argument that from a group of 14.9 million to 20.9 million potential class members, there is a high likelihood that at least 40 experienced violations). The Court also rejected using the speculation of the defendant's executive that thousands of disabled individuals patronized their restaurants and traversed the parking lots as evidence, explaining it is "speculation squared." *Id.*; *see also Vega v. T-Mobile USA*, 564 F.3d 1256, 1267 (11th Cir. 2009) ( "it might be tempting to assume that the number of retail sales associates [T-Mobile] employed in Florida during the relevant period can overcome the generally low hurdle presented by Rule 23(a)(1)," but it is an abuse of discretion to reach that conclusion without evidentiary support).

[31] *See also Carrera v. Bayer Corp.*, 727 F.3d 300, 307-08 (3d Cir. 2013); *Astrazeneca AB v. UFCW (In re Nexium Antitrust Litig.),* 777 F.3d 9, 19 (1st Cir. 2015) ("At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members. The court may proceed with certification so long as this mechanism will be 'administratively feasible.'"); *Karhu v. Vital Pharm. Inc.*, 621 Fed. Appx. 945, 947 (11th Cir. 2015).

and therefore lack a cognizable injury under Article III").[32] Without evidence providing an administratively feasible mechanism to make such determinations, class certification must be denied.

Carroll contends the ability to ascertain class members is satisfied because the "class definitions provide specific and objective criteria for determining class membership" and that "the data provided to SGS by AHFC, and SGS's own detailed call records [include information regarding the lessee] derived directly from AHFC credit applications, which information is inherently reliable."[33] (Dkt. 180-1 at 22.)

But Carroll's "best evidence" for determining class members  - SGS's records - do not even identify him as a class member since they only identify the intended recipient, Cindy Carroll. His wife misrepresented that Carroll's cellphone number was her "home number"[34] on the credit application at the request of Carroll, who wanted his cellphone number used to obtain better lease terms. (Dkt. 40 at 1.)[35] According to Carroll, SGS called the number reflected in its records as Cindy Carroll's home number and reached his cellular phone.

Thus the calls to Carroll were actually "wrong number" calls, and he could only be identified by resorting to the subjective interpretation of unreliable third party data by his purported expert. But because no "wrong number" indicator is present in SGS's records with regard to the

---

[32] Although the Court did not reach the Article III issue, finding it moot because certification was improper in the first place, this signals that the 5th Circuit is aligning with the 2nd in concluding that "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank*, 443 F.3d 253 (2d Cir. 2006). In fact, the concurrence states that the lack of standing of class members was sufficient to deny certification in and of itself. *Flecha*, 2020 U.S. App. LEXIS 481, at *16.

[33] This claim of 'inherent reliability' is mere speculation by Carroll unsupported by any evidence or authority. Carroll cites the declaration of Michael J. Greene, but he merely explained how the records are maintained, he did not opine about their reliability. Presumably Carroll hopes this Court will assume financial records are inherently reliable, but empirical evidence demonstrates that to be an incorrect assumption. *See* Attachment D at ¶ 20 (finding, on average, 39% percent inaccuracy for information in financial services data).

[34] This misrepresentation also demonstrates why Carroll cannot rely upon self-identification of the type of phone number (i.e. "home," "cell," or "work") to conclude that it is accurately identified.

[35] *See also* Cindy Carroll's Credit Application, Dkt. 26-7 at 8; Dkt. 30-1 (the Credit Application states: "I certify that . . . all information provided by me for this application is true, correct, and complete").

9

calls to Carroll, those calls prove that there is no way to determine from SGS's records whether pre-recorded message calls reached the intended recipient (or an unintended recipient like Taylor Carroll). Rather than demonstrating that membership in the class is ascertainable, Carroll's situation proves just the opposite.

Absent from Carroll's discussion of SGS's call records is any suggestion that the records identify the names of the <u>actual recipients</u> of calls, as opposed to the names of the <u>intended recipients.</u> Carroll provides no mechanism to filter out individuals who were the intended recipient such as his wife and identify individuals who were the unintended recipients such as himself. Thus every call would have to be evaluated to determine whether the call connected to a phone number being used by the lessee or by some other person. *See, e.g., Sandoe v. Bos. Sci. Corp.*, 2019 U.S. Dist. LEXIS 183886, at *15 (D. Mass. Oct. 23, 2019) (denying class certification in case where Verkhovskaya identified a 15% wrong-number rate in a sample set through her reverse append search). The *Sandoe* court also noted that identification of call recipients was complicated by the fact that "up to 75% of cell phone carrier plans are friends and family plans meaning that a single subscriber is associated with multiple phone numbers." *Id.*

A phone number called by SGS may not have belonged to the lessee at the time of the call because, for example, (1) a cellphone number was surrendered by the lessee and reassigned[36], (2) the lessee changed employment and the phone was provided by the prior employer[37], (3) the lessee gave the cellular phone to another person to use ( e.g. friend or family member), [38](4) for landlines,

---

[36] According to the FCC, approximately 35 million wireless telephone numbers are disconnected each year and 100,000 are reassigned by wireless carriers every day. Attachment D at ¶ 22; Expert Report of Aaron Woolfson, "Attachment F" at ¶ 73, citing *In re Advanced Methods to Target* and *Eliminate Unlawful Robocalls*, *Second Notice of Inquiry* FCC-CIRC 1707-02, C.G. Doc. No. 17-59, June 22, 2017. Therefore, the typical wrong number call is going to involve someone that received a reassigned number and has no relationship to the lessee - adding another hurdle to identification.

[37] *See* Attachment D at ¶¶ 13-14.

[38] *See Sandoe*, 2019 U.S. Dist. LEXIS 183886, at *15; Dkt. 180-15 at 223-224.

the lessee moved and obtained a new number, (5) the lessee decided to no longer have a landline, surrendered the number and it was reassigned to another person, or (6) the lessee, such as Cindy Carroll, misrepresented another person's phone number as their own. All of these could occur unbeknownst to AHFC, making a number provided by AHFC to SGS unreliable as the means to identify the recipient of a call. [39]

Carroll acknowledges the inevitability of "wrong numbers" but asserts that codes and comments in SGS call records could be utilized to exclude "wrong number calls" from the class, thereby eliminating the need to use third party data providers and his expert's dubious methods to identify members of the class. (*Id.* at 22-23). This contention is belied by the fact that no code or comment so identifies the calls to Carroll, which were intended for his wife. The absurdity of this contention is further highlighted by the fact that Carroll's class claims only include prerecorded message calls initiated by an ATDS without an SGS agent on the line. Only a human interaction could possibly determine if the person on the other end of the line was not the lessee and that the call reached the wrong person. [40] For calls received by an answering machine or voicemail, even a

---

[39] Carroll has not, and could not, reasonably propose that every user of a reassigned telephone number or non-lessee who received calls which included a prerecorded message affirmatively notified SGS that he or she was not the intended recipient of the calls. Carroll himself did not notify SGS that it had not reached the lessee, Cindy Carroll. Similarly, Carroll could not reasonably assert that each lessee who had a change of numbers notified AHFC. Indeed numerous SGS calls went to wrong numbers. *See* Attachment D at ¶¶ 11-14.

[40] This is another instance of Carroll's use of smoke and mirrors. Carroll asserts codes exist for "dispositions such as wrong, disconnected or bad number . ." and that eliminating calls with these codes and using "comments" solves the wrong number problem. Dkt. 180-1 at 22-23. The codes cited by Carroll (1401, 1501 and 1601) indicate a phone number is "no good." *Id.* at 23. Carroll acknowledges that a "no good" number would include a "disconnected" or "bad" number as well as a "wrong" number. However, Carroll does not admit for non-agent prerecorded message campaigns, that although the SGS telephone system may be able to determine that no call connected because a number was disconnected or bad (e.g. invalid or incomplete phone number) the phone system is not able to determine that the number was "wrong" in that it belonged to or was being used by someone other than the intended recipient, the lessee. *See* Attachment C at ¶¶ 9, 13-15; Attachment D at ¶¶ 11-29. Mixing apples and oranges, Carroll claims that "wrong numbers" may be excluded by eliminating calls where comments exist that "identify wrong numbers or signify instances where agents spoke with the called individual such that a prerecorded message was not left" However, Carroll's own exhibit proves the falsity of that position. The only comments on Carroll's Exhibit 8 reflecting a "wrong" number exist for calls that were live agent calls where the live agent noted that the number was wrong after actually speaking with the call recipient. *See* Dkt. 180-9, lines 69, 104. Carroll can point to no "wrong number" comment in connection with any call his expert has identified as containing a prerecorded message.

human would not know whether it was a wrong number unless perhaps the machine's greeting included the name of the recipient. SGS could only identify a number as being a wrong number if the recipient actually told a live agent it is a wrong number. The calls identified by Verkhovskaya as containing pre-recorded messages had no live agent involvement. Attachment C at ¶ 7. Thus, there is no mechanism to accurately identify wrong number calls which contained pre-recorded messages. *Id*. Dialing from the same set of numbers, SGS agents often were told that they had reached a wrong number. And there is no way to know what other calls (like those which were not answered or only connected to a machine, and all non-agent calls) went to "wrong" numbers. *Id*. at ¶¶ 7-9.

Since it is impossible to identify the actual recipient of a call containing a prerecorded message from SGS's records alone, Carroll must (begrudgingly) rely on his expert—who is the subject of a pending *Daubert* motion (Dkt. 126)—and her flawed "reverse append" methods (supposedly a manner of divining historic and current subscriber and user names from information obtained from LexisNexis), the accuracy of which has been publicly disclaimed by LexisNexis and sharply rebuked as unreliable and inaccurate. *See, e.g., Sandoe,* 2019 U.S. Dist. LEXIS 183886; *Hunter*, 2019 U.S. Dist. LEXIS 137495, at *30.[41]

But even if her methods were reliable, her data would produce only a pool of persons who LexisNexis indicates are associated with the phone number. Those persons may be either 'subscribers' or 'customary users' of the phone number or have some other unknown and unknowable association with the number. This is hardly "sufficiently definite and readily

---

[41] Other courts have similarly rejected the use of such reverse-append tools to identify the users of particular phone numbers for the sake of determining class membership. *See, e.g., Jacobs v. Quicken Loans, Inc.*, 2017 U.S. Dist. LEXIS 176469, at *21 and n.4 (S.D. Fla. 2017); *Sherman v. Yahoo! Inc.*, 2015 U.S. Dist. LEXIS 127809, at *6 (S.D. Cal. 2015) ("plaintiff's belated proposal to use a reverse lookup also does not provide objective, verifiable criteria for identifying class members."); *Balshmiter v. T.D. Auto Fin. LLC*, 303 F.R.D. 508, 524-25 (E.D. Wis. 2014) (noting the inaccuracies of reverse lookup services and concluding that the use of such services alone could not adequately ascertain class members).

identifiable" to meet the standard necessary to define an ascertainable class. *Brecheir v. Republic of Argentina*, 802 F.3d 303, 305 (2nd Cir. 2015). "It's not that "any objective criterion will do. . . . [T]he use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Id*. Even if Verkhovskaya produced a list of the names associated with each phone number, individual inquiries to determine which, if any, of those persons was the actual call recipient would predominate over common issues.

The ascertainability requirement prevents the certification of a class whose membership is indeterminable. Because Carroll has offered no reliable, administratively feasible way to identify class members in reference to sufficiently definite objective criteria, his classes are not ascertainable and class treatment is not possible. It is unnecessary to consider whether Carroll's proposed classes satisfy the remaining standards for certification under Rule 23, and this Court should deny the Motion for Class Certification. *See Bush v. Calloway Consol. Consulting Grp. River City*, 2012 U.S. Dist. LEXIS 40450, at *8 (M.D. Fla. 2012) (holding that only "[a]fter a court determines that a class is ascertainable, can it then consider whether the Rule 23 factors are met.").

**B. Individualized Issues Predominate, Carroll is not Typical of the Class, and a Class Action is not Manageable and is not a Superior Mechanism to Resolve the Dispute.**

"[T]he party seeking class certification must actually establish [Rule 23's] requirements by a preponderance of the evidence." [42] *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014); *Mielo*, 897 F.3d at 483-84. The preponderance of the evidence standard applies to proffered evidence. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228-29 (5th Cir. 2009). Rule 23 requires courts to actually find the facts favoring class certification, not merely to inquire

---

[42] Which includes ascertainability through an administratively feasible process, typicality, superiority, predominance, and manageability, among others.

whether a jury reasonably could do so. *Id.* The proponents of the class bear the burden of demonstrating that a case is appropriate for class treatment. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001).

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodserv. Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013); *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). "[T]o determine whether a class certified for litigation will be manageable, the district court must at the time of certification offer a reasonable and workable plan for how [the plaintiff will prove class membership] in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018). In this case, there is no manageable and practical way to do so.

1. Discerning the identity of the person or persons that "to whom . . . SGS made an artificial or pre-recorded telephone message" relates, and whether that means the 'subscriber', 'customary user', or other requires an individualized inquiry.

By using the language "to whom SGS made an artificial or prerecorded telephone message," Carroll's Version 4.0 Class Definition fails to clearly define the classes. Does this mean the intended recipient, the phone number subscriber, the customary user of the phone, the actual recipient of the message, or some other person such as the person who actually retrieved a voicemail?  Previous class definitions floated by Carroll have included the word "received," and

throughout his Motion, Carroll references persons who "received" calls.[43] However, Carroll and his expert have offered no way to determine the meaning of "to whom" in the current class definition or who has the rights to any claim—be it the customary user, subscriber, or someone else — which also implicates Article III standing.[44] While 'subscriber' and 'customary user' may be objective terms, point of fact is that "[t]he 'customary user' sometimes differs from the 'subscriber' of a phone number," *Hunter*, 2019 U.S. Dist. LEXIS 137495, at *7 n.3. In instances where the subscriber is different than the customary user (*i.e.*, family plans) and the subscriber did not receive the pre-recorded message,[45] the only feasible way he or she would have Article III standing is if the account was impacted.[46]

Circuits are split on whether the "called party" in a TCPA action is the customary user, the subscriber, or both.[47] *See Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265, 1267 (11th Cir. 2014) (explaining that "called party" "means the subscriber to the cell phone service"); *Soppet v. Enhanced Recovery*, 679 F.3d 637, 643 (7th Cir. 2012) ("We conclude that 'called party' . . . means the person subscribing to the called number at the time the call is made"); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316 (3rd Cir. 2015) ("the FCC defined the 'called party' as the 'subscriber'

---

[43] *See* Attachment A; Dkt. 180-1 at 7, 8, 11, 12, 15, 16, 23.

[44] "[N]o class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264; *see also* Dkt. 124 (which SGS incorporates by reference); *Flecha*, 2020 U.S. App. LEXIS 481, at *18 (concurrence) ("Article III is just as important in class actions as it is in individual ones"). Notably, Carroll does not appear to dispute that all class members must possess Article III standing, only that he wants this Court to deal with that issue later. *See* Dkt. 180-1 at 24 ("jurisprudence from the Fifth Circuit and elsewhere maintains that a class definition may permissibly include a number of persons who are not damaged <u>because their claims can be eliminated in later stages of the proceeding</u> . . ."). However, he offers no mechanism to do so.

[45] Whether the subscriber received the pre-recorded message but was not the customary user of the phone (i.e. a parent that checks a child or spouse's voicemail) would be another issue that would have to be determined on an individual basis and would not be capable of being established through common evidence.

[46] This Court would have to individually determine whether the subscriber had an unlimited plan, in which case there is no impact, a limited plan, in which case there was only an impact if they went over their allotment of minutes, or if they paid per minute - and whether they actually paid the affected bill.

[47] This fact defeats typicality and commonality as well because Carroll is both the subscriber and customary user of the telephone number here, so he lacks any interest in arguing how this Court should decide this question, the outcome of which could negatively impact potential class members that are solely the subscriber or solely the customary user.

or 'customary user' of the phone number"); *Hunter*, 2019 U.S. Dist. LEXIS 137495, at *6 n. 2 (S.D.N.Y. Aug. 14, 2019) ("the proper interpretation of 'called party' is in flux in the wake of [] *ACA Int'l v. FCC*, 885 F.3d 687, 705-709 (D.C. Cir. 2018)).[48]

As an initial matter, for a nationwide class, this Court would be required to make an individualized inquiry into the location of each individual at the time each prerecorded message was received (both as to the call itself and when the voicemail was played), and how that Circuit has decided which category of persons can possess a claim, and then combine that information in order to reach an individualized determination as to what law applies to whom.

Regardless whether Carroll intends for the class member to be the subscriber, customary user, or actual recipient of a call where a prerecorded message played, SGS's records do not tell you who that is, and Verkhovskaya has not provided any mechanism to make those distinctions. As a result, it is impossible to even determine which telephone numbers require this individualized inquiry - meaning it must be done for tens of thousands of phone numbers and potentially hundreds of thousands of calls.

Where multiple people are associated with a phone number – an occurrence readily conceded by Verkhovskaya, she proposes a non-solution: notify everyone. (Dkt. 180-15 at 175-177). Carroll does not propose how to determine who (if any of them) should be a class member, just that "their claims can be eliminated in later stages of the proceeding." (Dkt. 180-1 at 24). But SGS's records can't provide that solution, otherwise Carroll would not be a class member. Therefore, mini-trials would be required to determine who was an actual call recipient.

These mini trials cannot be avoided by, for example, having potential class members self-

---

[48] *See also Leyse v. Lifetime Entm't Servs.*, 2015 U.S. Dist. LEXIS 139100 (S.D.N.Y. 2015) ("only 'called parties' under the statute have standing to bring suit under the TCPA") (*aff'd by Leyse v. Lifetime Entm't Servs.*, 679 Fed. Appx. 44, n.3 (2nd Cir. 2017) based upon other issues, and not deciding whether the plaintiff, as a customary user, was a "called party").

identify. In apparent recognition of the many issues with self-attestation, Carroll has not proposed

such a process. It is too late for Carroll to attempt to inject a self-attestation process into this

matter [49] and, regardless, it would not overcome the deficiencies with Verkhovskaya's

methodology because self-attestation is fraught with Due Process and evidentiary issues.[50] Those

issues are exacerbated for TCPA claims that carry relatively large potential recoveries.[51] Given the

volume of calls alleged by Carroll, SGS would be faced with millions of dollars in potential

liability for non-existent claims. Therefore, to protect SGS's Due Process rights, countless mini-

trials to challenge the self-identifications would be necessary.

    2.  <u>Whether an artificial or prerecorded voice actually played on a call requires an individualized inquiry.</u>

Carroll seeks to impose liability under the TCPA's prohibition on the use of an artificial or

---

[49] Like the plaintiff in *Karhu*, Carroll "has not himself proposed an affidavit based method, [so] he necessarily ha[s] not established how the potential problems with such a method would be avoided" and "[w]ithout a specific proposal as to how identification via affidavit would successfully operate, the district court ha[s] no basis to accept the method." *See Karhu*, 621 Fed. Appx. at 948-49 ("a plaintiff cannot satisfy the ascertainability requirement by proposing that class members self-identify (such as through affidavits) without first establishing that self-identification is administratively feasible and not otherwise problematic").

[50] *See Sandoe*, 2019 U.S. Dist. LEXIS 183886 (rejecting self-attestation process to overcome deficiencies in Verkhovskaya's process, explaining "the challenged affidavits would be inadmissible and each of the thousands of putative class members would be subject to cross-examination at trial . . ."); *see also Sandusky v. ASD Specialty*, 863 F.3d 460, 473 (6th Cir. 2017) (affirming denial of certification; district court concluded that "having class members submit individual affidavits testifying to receipt . . .was not feasible . . . and [f]inding out which . . . were being untruthful would require scrutinizing each affidavit . . ."); *Karhu*, 621 Fed. Appx. at 948-49 ("The potential problems with self-identification-based ascertainment are intertwined. On the one hand, allowing class members to self-identify without affording defendants the opportunity to challenge class membership 'provides inadequate procedural protection to defendants and implicates their due process rights [] On the other hand, protecting defendant's due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a 'series of mini-trials just to evaluate the threshold issue of which persons are class members'"); *Menachem Raitport v. Harbour Capital*, 312 F. Supp. 3d 225, 236 (D. N.H. 2018) ("Here, as in Sandusky, individualized questions concerning which of nearly 30,000 potential recipients actually received a particular unsolicited fax from [defendant] more than a decade ago render [plaintiff's] proposed class unascertainable and the potential reliance upon individual affidavits unreliable").

[51] Here, each class member allegedly receive six to nine calls and has a potential claim for up to $13,500. *See Wilson v. Badcock*, 329 F.R.D. 454, 459 (M.D. Fla. 2018) (denying class certification in which self-attestation affidavits were not sufficient to overcome deficiencies in Verkhovskaya's process, explaining that "while an affidavit certifying inclusion in a class might be appropriate in some cases where damages for an individual claimant are negligible, here Defendant could face up to $1500 per call. This amount is relevant both as an incentive for individuals to improperly enter the class and . .. [is] a danger that impacts due process protections for Defendant"); *see also Karhu*, 621 Fed, Appx. at 953 (concurrence explaining that some courts have allowed certification of classes related to purchase of low-value items through self-identification, "they have been more reluctant to certify when the per-class member claim is larger" and identifying a claim of $2,500 per class member as 'not small').

prerecorded voice that constitutes telemarketing. But for liability to attach under this prohibition, such a voice "must actually play" on a call. *Ybarra v. Dish Network, LLC*, 807 F.3d 635, 640 (5th Cir. 2015); *Sliwa*, 2019 U.S. Dist. LEXIS 167805, at *55; *see also Flecha*, 2020 U.S. App. LEXIS 481, at *12 (explaining that in FDCPA context, class members that ignored a letter as junk mail would lack Article III standing because the message contained therein was not received). Here, it is not possible to determine on a class-wide basis whether a pre-recorded message played on any given call—only that it *might* have played.[52] Neither SGS's records nor Verkhovskaya's methodology can provide this information; it is entirely unknown and unknowable absent live testimony from each purported class member.[53]

Carroll wrongly contends that this requirement may be satisfied by reference to certain Status ID codes included in the class definition. But without evidence of what data was used to generate those codes, Carroll cannot establish those codes as a manner of common proof. And Carroll offers nothing but his own conjecture to rebut SGS's expert's opinion that those codes are not a reliable indicator that a prerecorded message played.[54] Therefore, Carroll lacks any common evidence that can be used to establish on a class-wide basis whether the pre-recorded message played on any individual call and whether such a message was actually heard and, if so, by whom.

SGS is entitled to present its defense to every call, which at a minimum would include subpoenas to every class member to compare their phone records to SGS's call logs to determine whether a call actually connected and was of sufficient duration for a message to play. This alone

---

[52] *See, e.g., Roberts*, 2016 U.S. Dist. LEXIS 97177, at *5 ("Because a call in which a prerecorded voice 'might, but does not, play' does not trigger violation of the TCPA, any calls that were blocked by the call-blocking application do not constitute violations and are not at issue here").

[53] Attachment C at ¶ 12; Attachment F at ¶¶ 83, 85.

[54] *Id.* at ¶¶ 75-92. Carroll exclusively relies upon a misrepresentation of Keith Phillips deposition testimony that SGS's records are the "best evidence" that SGS has, to assert that SGS's records can reliably identify whether a recording played. *See* Dkt. 180-1 at 3, n.4, *supra* at n.6. However, neither Keith Phillips nor anyone else ever testified that the Status ID codes are a reliable indicator that a prerecorded message actually played. *See id.*

would make trial of this case unmanageable.

### 3. Whether the telephone numbers called by SGS were residential landlines requires an individualized inquiry.

Carroll asserts that the 'Pre-Recorded Message Class' is limited to messages that actually played on a non-business residential or cellular telephone. (Dkt. 180-1 at 4.) Carroll apparently intended to achieve this result by defining the class based upon telephone numbers "designated as a home number." *Id.* at 3.[55] However, Carroll is the perfect example of why this Court cannot rely upon the self-identification of the type of telephone number that was provided.[56] His wife wrongly designated his cell number as her home number. Yet, Carroll's attempt to certify this class based upon SGS's and AHFC's records alone would depend upon self-identification being accurate (and remaining accurate for years into the future), which it demonstrably is not.

As a result, Carroll must rely on Verkhovskaya to attempt to identify whether a landline was used for residential or business purposes at the time particular prerecorded messages were received as far back as six-years ago. However, Verkhovskaya's method has already proven to be ineffective in simply identifying the subscribers and customary users of telephone numbers. Determining if a particular telephone number was used for a business at the time it received a pre-recorded message compounds the flaws in Verkhovskaya's process.[57] Furthermore, as noted

---

[55] The only way a claim for receiving a prerecorded message at a landline can exist is if it is a residential telephone line, so this limitation necessarily follows. *See* 47 U.S.C. § 227((b)(1)(B). The class definition would be improper to the extent it included individuals that received prerecorded messages at a non-residential landline, and inclusion of such claims in the class would further defeat the requirements of Rule 23(a).

[56] To the extent Carroll argues that the disposition code 801 and 1201 establish that a home number was called, the same flaw applies. *See* Dkt. 180-1 at 11. Those codes reflect calls to what was designated in SGS's system as the home number based upon the lessee's previous self-identification. *See* Dkt. 30-5 at pp. 3-6.

[57] This is presumably why Carroll buries in a footnote his only reference to using the business append process, citing it in support of the claim Verkhovskaya can further verify class members, and explaining "[t]he business append is not necessary for the Cell Phone Class" - with the obvious implication that it is necessary for the Prerecorded Message Class. Carroll makes no other mention of this "business append" process (besides repeating that it is not necessary for the Cell Phone Class on the following page). The "business append" process involves making a subjective review of the unreliable "reverse append" process results, and determining which names in those results appear to be businesses and which appear to be individuals (and somehow being able to decide which category Calvin Klein, for example, should fit under).

19

above, in the "corrected" data produced by Verkhovskaya after her deposition she only identified calls to wireless numbers and produced no data relating to calls to non-wireless numbers. As a result, the actual volume of non-wireless numbers for which Verkhovskaya would apply her business append method is unknown.

To identify if a number was a business line years ago, Verkhovskaya proposes to again turn to LexisNexis and its admittedly unreliable data. *Id.* at ¶¶ 55, 59; (Dkt. 126-1 at 11-13.) Yet, she fails to explain how such information can be divined. (Dkt. 126-2 at ¶¶ 54-60.) In fact, in her Report, Verkhovskaya does nothing more than explain she will rely upon LexisNexis information to distinguish business telephone numbers from non-business telephone numbers, without any explanation how she will do it.[58] At her deposition, even while attempting to minimize the inaccuracy of her method, she admitted that the historical business append searches have a failure rate as high as 14%, and she does not provide any basis to believe it could not be much higher. (*See* Dkt. 126-1 at 11; Dkt. 180-15 at 56-57, 140-167.)[59] Verkhovskaya has effectively acknowledged that she cannot reliably determine whether a telephone number is a business or residential landline, a conclusion confirmed by SGS's Expert. Attachment F at ¶ 114.

Moreover, any residential telephone number provided to AHFC at the inception of the lease would not have received any telephone calls from SGS until the end of the lease term - typically three years later. (*See, e.g.,* Dkt. 26-7 at ¶ 12.) Even if the telephone number was a residential

---

[58] Dkt. 180-13 at ¶¶ 53-59.

[59] Since being retained as an "expert," Verkhovskaya has admitted that she expects her first level reverse append method and the business append method which would follow to be inaccurate as much 14% of the time, resulting in identification of putative class members that would, as she admits, be both over-inclusive and under-inclusive. Dkt. 180-15 at 213-16. It is not surprising Carroll is trying to distance himself from this unreliable methodology, especially since her admissions involve optimistic expectations - the actual results would almost certainly be even less reliable. *See* Attachment D at ¶¶ 19-31; Attachment E at ¶¶ 15, 23-27; Attachment F at ¶¶ 42-53, 73-74; *see also* Dkt. 126 (*Daubert* Motion identifying Verkhovskaya's lack of expertise or reliable methodology); *Sandoe*, 2019 U.S. Dist. LEXIS 183886 (denying certification in wrong-number class action and criticizing Verkhovskaya's ability to distinguish actual recipient of calls from intended recipient through her reverse-append process).

landline at the time it was provided, there is no reason to believe that it remained such.[60] It also could have been ported to a business or reassigned to someone using it while working from home. This necessitates an individualized inquiry as to each landline called.

This individualized inquiry cannot be avoided under any circumstance because some residential landlines may be used for both business and residential purposes (i.e. home business owners and people that work from home). In those instances, it is a question of fact whether the protections of the TCPA apply. *See Blevins v. Premium Merch. Funding One*, 2018 U.S. Dist. LEXIS 183362, at * 6 (S.D. Ohio 2018) ("courts have routinely looked at the facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes").[61] Since the manner in which a landline is used is a genuine issue of material fact that must be decided for every class member that received a pre-recorded message on a landline, discovery and mini-trials on this issue with respect to each unique telephone numbers would be required.[62] Those individualized determinations would predominate over the claims of the Pre-Recorded Message Class, and this Court should deny certification as to the Pre-Recorded Message Class.

---

[60] *See, e.g., supra* at n.33.

[61] *See also Owens v. Starion Energy*, 2017 U.S. Dist. LEXIS 101640, at *7 (D. Conn. 2017) (in addressing whether a "home-based business telephone number can be considered 'residential,' the Court explained that "district courts in this Circuit and elsewhere have found that whether a telephone number is truly 'residential' is a question of fact that is not appropriate for resolution at the motion to dismiss stage"); *Bank v. Indep. Energy Grp.*, 2015 U.S. Dist. LEXIS 96532 (E.D.N.Y. 2015) (granting defendant's summary judgment because the defendant provided evidence that a telephone number registered as 'residential' with the telephone company was being held out to the public as a business line); *Clauss v. Legend Secs.*, 2014 U.S. Dist. LEXIS 184286 (S.D. Iowa 2014) (denying summary judgment because a genuine issue of material fact remained as to whether the telephone number at issue was a business or residential number at the time of the calls, and "the FCC encouraged case-by-case review of claims involving home-based businesses 'to determine whether or not the call was made to a residential subscriber'").

[62] This process is further complicated when it is recognized that class members may have temporarily worked from home or operated a home business, resulting in a need for an impossible level of precision regarding the dates on which a telephone number was residential and when it was a business line. Even if this could be accomplished, it would require countless individualized factual determinations that would predominate.

4.   <u>Carroll's Claims are not Typical of the Proposed Class Members' Claims.</u>[63]

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented." *Danvers Motor v. Ford Motor*, 543 F.3d 141, 149-150 (3rd Cir. 2008); *Langbecker v. Elec. Data Sys.*, 476 F.3d 299, 314 (5th Cir. 2007) ("Rule 23(a) requires that the named representative's claims be typical of those of the class").

Carroll is an atypical class member. Carroll alleges the class members may be identified solely from SGS's records. However, the only persons identifiable from SGS's records are vehicle lessees and Carroll is not a lessee. By relying upon SGS's records alone to identify class members, Carroll had made himself atypical of the class he seeks to represent. Carroll has repeatedly claimed this is not a wrong-number case, implicitly acknowledging the significant distinction between such claims and ones in which the intended recipient was called,[64] but that's what the calls to him were: wrong number calls. Therefore, while the class Carroll seeks to represent can only be comprised of intended recipients (a necessary consequence of relying exclusively on SGS and AHFC's records to determine membership), his claim is only typical for a wrong-number case.[65]

5.   <u>A Class Action is not a Superior Mechanism and Would not be Manageable.</u>

Rule 23(b)(3) requires that a class be "superior to other available methods for fairly and efficiently adjudicating the controversy." "The greater the number of individual issues, the less

---

[63] For the same reasons Carrol is not a typical class member, he is not an adequate class representative under Rule 23(a)(4).

[64] *See, e.g.,* Dkt. 149-2 at 6 ("This case is not a wrong-number TCPA case where the identities of phone number subscribers are not known. Both AHFC and SGS produced detailed information for every phone number that was called and included in the proposed class definitions . . . This type of information, for every call to each class member, allows confirmation of the identity of every class member . . .").

[65] Because Carroll's claims are not typical of the absent class members, there is a lack of commonality between Carroll's claims and the class claims as well under Rule 23(a)(2).

likely superiority can be established." *Castano v. Am. Tobacco*, 84 F.3d 734, 745 n.19 (5th Cir. 1996). "Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *Id*. at 742. "The most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit," one in which the cost of bringing an individual claim outweighs the likely recovery.[66] *See id*. at 748.

Managing this case would require a Herculean effort to identify the class members and, if they were identified, whether a message played (both of which are *impossible* to determine from SGS's records alone).[67] Doing so would require more discovery, followed by countless mini-trials on individualized issues for the class members. Carroll advocates that this Court proceed to certify a class knowing that it includes persons who would have not claim or injury "because their claims can be eliminated in later stages of the proceeding . . ." (Dkt. 180-1 at 24.) However, Carroll does not explain how this could be done or why that approach passes muster. Carroll's own situation proves that SGS's records may not be relied upon to identify persons who would have a claim, and his expert admits that her methods have an error rate of up to 14%.[68] What Carroll leaves unsaid is that, given the inherent unreliability of both of his proposed methods of ascertaining class members, there is no way to know which persons identified have claims without obtaining and evaluating evidence as to each one. In her recently revised data, Verkhovskaya asserts that there are 118,687 phone numbers representing 549,299 calls which would be included in the class.[69] If

---

[66] Carroll's chief argument for superiority is that a class action is "the *only* way to afford relief to those whose claims are too small to justify individual lawsuits." Dkt. 180-1 at 20.

[67] Notwithstanding Carroll's assertion that the class action would be manageable because the class members "are easily identified from SGS's own records, [and] there are no individual issues" Dkt. 180-1 at 21.

[68] A figure well below reality. *See* Attachment E at ¶ 27 (finding that in a sample of 200 numbers there was a direct link between the named lessee and the number SGS called less than 35% of the time).

[69] SGS presents the results of her analysis as stated by Verkhovskaya. However, the data actually produced by Verkhovskaya in connection with her "corrected" results reflect 280,510 calls to 62,579 phone numbers. *See* Attachment D at ¶ 32 (explaining that no non-wireless numbers were actually identified in Verkhovskaya's revised data set, meaning the wireless figures are the only ones in data set); Dkt. 180-16 at 1.

14% of those calls are incorrectly associated with persons who would be in the certified class, but aren't the actual recipient of a call, SGS would face liability of $115,352,790 (76,902 x $1500) to persons who wouldn't have a claim. SGS could then face liability in that same amount to the actual call recipients unless those erroneously identified class members are "eliminated in later stages" as suggested by Carroll. Under this "certify now, address the problems later" proposal, the jury in this case would face the impossible task of evaluating evidence for 118,687 phone numbers and making individual determinations based upon yet-to-be gathered evidence as to whether the class member identified by Carroll is the right class member. For those the jury determines did not have the phone number or receive calls, the Court would then would have to eliminate those persons from the class and then address the procedural dilemma of what to do with regard to persons who the evidence might suggest did receive calls but who weren't provided notice. Rather than addressing these problems and providing a workable solution, Carroll drives by the manageability problem by simply suggesting that the Court can deal with it later.

The variety of issues that would require individual determination demonstrate that the class action process is not the superior method of addressing these claims. Despite Carroll's naked assertion to the contrary,[70] there is ample incentive for class members to bring their claims individually. As Carroll claims, after receiving two calls, "[a]ll class members received an additional four to seven prerecorded telephone messages . . . ," which equates to statutory damages of $9,000 to $13,500 each based upon allegedly willful violations. (Dkt. 180-1 at 8.)

Individual TCPA lawsuits are commonly brought, and the potential recovery here is ample to incentivize class members to bring individual claims, as was the intent of the TCPA. *See Forman v. Data Transfer*, 164 F.R.D. 400, 404 (E.D. Pa. 1995) ("The statutory remedy is designed to

---

[70] Carroll argues that many class members would abandon legitimate claims because their claims are "too small to justify individual lawsuits" without any basis for that assertion. Dkt. 180-1 at 20.

provide adequate incentive for an individual plaintiff to bring suit on his own behalf").[71] This incentive structure has led Courts to deny class certification in TCPA cases based up a lack of superiority.[72] This Court should find the same and deny Carroll's Motion for Class Certification.

## CONCLUSION

For all these reasons, the Court should deny Plaintiff's motion for class certification.

Respectfully submitted this 5th day of February, 2020.

> **MCGLINCHEY STAFFORD, PLLC**
>
> /s/ Daniel T. Plunkett
> _____
> DANIEL T. PLUNKETT (#21822)
> 601 Poydras Street, Suite 1200
> New Orleans, LA 70130
> Telephone: (504) 586-1200
> Facsimile: (504) 596-2800
> Email: dplunkett@mcglinchey.com
>
> and
>
> C. KIEFFER PETREE (#31206)
> 301 Main Street, Suite 1400
> Baton Rouge, LA 70801
> Telephone: (225) 383-9000
> Facsimile: (225) 343-3076
> Email: cpetree@mcglinchey.com
>
> *Attorneys for SGS North America Inc., improperly named as SGS Automotive Services, Inc.*

---

[71] *See also Applestein v. Fairfield Resorts*, 2009 Md. App. LEXIS 204 (2009) (affirming denial of class certification despite the requirements for class certification being met, explaining that the legislative history for the TCPA shows a clear intent to incentivize a few pro se suits in district court to curtail abusive phone calls); *Local Baking Prods. v. Kosher Bagel Munch*, 421 N.J. Super. 268 (N.J. Super. Ct. App. Div. 2011) ("Congress has presented an aggrieved party with an incentive to act in his or her own interest without the necessity of class action relief"); *Blitz v. Xpress Image,* 2006 NCBC 10 (2006) ("In discussing the efficacy of the TCPA statutory remedy during debate on the proposed legislation, Senator Ernest "Fritz" Hollings of South Carolina noted: 'Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer.' 137 Cong. Rec. S16205 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings).").

[72] *See, e.g., Local Baking*, 421 N.J. Super. At 476 ("We conclude that a class action suit is not a superior means of adjudication a TCPA suit . . . Congress has presented an aggrieved party with an incentive to act in his or her own interest without the necessity of class action relief"); *Applestein*, 2009 Md. App. LEXIS 204 (2009).

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 5, 2020, a copy of this pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's CM/ECF system.

*/s/ Daniel T. Plunkett*
Daniel T. Plunkett

1293203.1